Mr. Henderson, whenever you're ready. May it please the court, my name is Tim Henderson and I represent the appellants Goldfarb and Gallagher in this case. I thought at first I'd just go over some of the key facts which put in perspective why we believe the district court erred. And I thought it would be very helpful to turn the court's attention to Exhibit 57, which is in the exhibits. It's a map of the site. And it shows you where the, if you read the briefs, you'll read about the Russell Street properties, the Warner Street properties, and the Waterfront properties. And the Russell Street and Warner Street are now a casino and a parking lot. The Waterfront properties are still, they're a park. And the exhibit also shows the Gwens Falls Trail, which is prominent in our pleadings as to what's been impacted. So I'll refer to the exhibit on and off. The purpose of our complaint, and I'm going to use some buzzwords, but we had a complaint under 42 USC 6972A1B. And we alleged that, not alleged, we sought the addressing, preventing, eliminating the continued, imminent, and substantial threat of endangerment to health and the environment from the solid and hazardous waste contaminants located in, on, and under the casino site, the Waterfront parcels, and continuing to migrate to the middle branch of the Patapsco River. Counsel, this is your time, and you can argue it as you want. But I think the court's familiar with the district court's decision, and what you need to do is tell us why it was wrong. Yes, Your Honor. Well, one of the key reasons it's wrong, I just want to go through some basic, what I say are facts. That first, the appellants have stepped in the shoes of the EPA and MDE in enforcing the law. Secondly, the site is heavily contaminated. Third, Maryland Chemical Operations contributed for 50 years to these contaminants. The city and the CBAC's construction activities on the site disturbed and mixed these chemicals and caused problems. The district court's decision to dismiss relied on documents that were outside the scope of the complaint to deny the appellants the opportunity to dispute or challenge them through discovery. We didn't have the opportunity. And these documents included two key documents. Included two what? Two key documents. A Maryland general permit for stormwater discharges from construction sites. Is that under the Clean Water Act? That is a Clean Water Act discharge permit. It's a general permit for stormwater only from point sources. And they also included a response action plan that's developed pursuant to a Maryland law, a voluntary cleaner program for voluntary remediation. And they asserted that the two were, that the RAP response action plan was part of the general discharge permit. And based on that, the court dismissed the casino, CBAC, under what's called the anti-duplication clause of the Resource Conservation Cover Act. When the district court dismissed the, I guess this is your subsection A claim, against the casino, the CBAC is the casino, correct? Correct. The casino CBAC. So what's your take on the basis for the dismissal? Did the court dismiss it under 12B1 or 12B6? 12B6. You're sure? You can't be sure when you read the opinion. The opinion does go into and lays out the grounds for a 12B1 analysis. And then they apply it to what is appropriate, the notice provision in the citizen suit law. And they said we provided sufficient notice. They went through the very facts that they used in the 12B6 analysis to say that we didn't provide sufficient facts. But the way I read the opinion is that the 12B1 analysis was for the notice provision. I'm not sure I'm following you there. If the court dismissed it under 12B6, why was it doing a 12B1 analysis? It had to do a 12B1 analysis to evaluate whether we had provided sufficient notice before filing the complaint in court. And so if you look at the opinion, it presents 12B1. It goes through standing. It goes through the notice provision. And then it concludes that the plaintiffs had sufficiently provided notice. So, putting it aside, from my perspective... I don't want to belabor this, but I think it has some significance. The casino is dismissed before the district court gets to the part of its opinion that says it's considering 12B6, which would seem to indicate it dismissed it on jurisdictional grounds under 12B1. Maybe it didn't. That's why I asked the question. But that has some impact on whether or not the court is bound under Rule 12D in terms of conversion to summary judgment and what it can consider. Yes, Your Honor. I agree. So, I guess my opinion is that it's ambiguous. You can't tell for sure. It's not stated explicitly. Even if Judge Bennett did apply 12B1 analysis, we've in our reply explained why that was inappropriate and wrong because the statute provides only two bases for a court to rule under 12B1. The notice provision and the diligent prosecution provision in the RECRA citizenship provision. And that's our position. That's what we've laid out. So, you are arguing that the anti-duplication provision is jurisdictional, not jurisdictional? Not jurisdictional. It is not a jurisdictional. Well, anti-duplication is a directive to... What is it? The nature of it? Affirmative defense or something? It would be a defense. And what the defendant needs to show is what's inconsistent, where there's duplication. I'm going to take, not to interrupt, but that kind of takes me back to the original question. If the district court dismissed under 12B1, it had to find it was jurisdictional. Wouldn't it? And I believe it did find it was jurisdictional. Well, it erred if it ruled that it was not jurisdictional under the anti-duplication clause because the anti-duplication clause isn't a basis for jurisdiction. It's a defense. The burden is on the defendant to show there's inconsistency. The burden is on the defendant to show... I mean, if you look at the statute... Well, is part of your argument that it should go back on a motion to dismiss because we can't tell what the district court did? Well, I would... I think we're beyond... I would... My preference is it gets remanded to the court and we start... Well, I know that, but we have to have reason. And the reason, I think, would be that the application of the judge of the anti-duplication analysis was wrong either way. Even accepting the documents in the record and going through the documents, they don't support what the judge ruled. But the simplest decision would be to say it wasn't a 12B1 in these records. These documents should not be in the record. I guess I want to win either way. I mean, I'm not being facetious, but... And I am prepared to talk about what the documents in the record show and why... You're saying the court didn't take judicial notice or he didn't follow the right procedures for taking judicial notice? That's another ambiguity in his decision, Your Honor. It appears to... When you read the words, he doesn't say he's taking judicial notice. There was no application of the federal rule. Was there a request for judicial notice? I'm sure my esteemed counsel will say there was. I'm asking you what your position is. My position is there was not and it was not officially noted by the court and he did not follow the federal rule 201. So you're saying you didn't get a chance to object? Correct. Well, you could have gone back in after he filed his opinion and asked him to do something, couldn't you? Give you some vacating, give you a chance to object? We could have. We could have. We chose not to. Is that fatal to your claim here? You didn't avail yourself of that opportunity? On that point? On that point, what, by objecting to saying that there was no judicial notice? But you're not here to say he erred, but you didn't tell him he erred. That's correct. And give him a chance to fix it. You usually have to tell the judge that they're doing something wrong or they're about to do something wrong and give them a chance to do right. You're correct, Your Honor. We did not avail ourselves of that opportunity. Well, did you tell him that you needed discovery and that he'd improperly converted it to a summary, that it should have been converted to a summary judgment and therefore you should have had discovery? Did you tell him that? No, Your Honor. We did not communicate with the court after the decision was issued. Well, let's assume the district court dismissed the casino on the 12B6 grounds. Tell us where and give us a site and a record on where you told the district court that it couldn't rely on these documents that the defendants attached to their motion to dismiss. You can do it on rebuttal if you want to, but I think that's important out of the file of Judge Kingsley. Where we did not tell the judge, Judge Bennett. I believe in the, we did have a survey ply, and in our survey ply we specifically addressed that issue. You told him you can't rely on these documents. Correct. And he filed your survey ply. He granted your motion. He granted the survey ply. He said they raised things in their reply that went beyond the reply. Right. They raised new matters in their reply, so he authorized you to file that survey. That's where you got into it, so you saved it there, you say, in the survey ply. We did, and in our main brief. In your what? In your initial brief? In our initial brief, we pointed out that you say these things were wrong to consider. Well, we now know in our response. I'm sorry. We filed the main brief. They replied in response to them, and then our survey ply, we brought it up again. Okay. So you told him there he can't rely on the attached documents. Did you dispute the accuracy of the documents? Correct. You did, and that's all in the survey ply. That would be in the response, before the survey ply. Did you take the position that even if they were considered, they had to be viewed in the light most favorable of you? Correct. As opposed to being in the light most favorable to the other side. We did, correct. Because it was on what then? 12B6. So anything that's considered has to be in the light most favorable to the plaintiff, right? Yes, Your Honor. We did point that out and emphasize to the judge. The judge… Go ahead and finish your answer. I was saying the court decision, I think even acknowledged that we did that, but they said that it was that they felt, not that he reviewed the documents, and he accepted the documents as accurate and true. And not only that, he accepted them as he addressed them as if they were public documents. And again, we pointed that out in our reply brief to this court, that we were not given an opportunity to debate these non-public documents. And if you take judicial notice, the only basis for taking judicial notice is that the document exists, not what the contents of the document are. And so we've not had the ability to go in. And one of the sort of simple things that has not been fully vetted in a trial court is, what does this general permit say? What's it do? A general permit on the Clean Water Act. You have the Clean Water Act, which regulates water discharges. You have the Resource Conservation Recovery Act, which regulates hazardous materials, non-hazardous to solid waste. The general permit you're talking about, is that the NPD? The NPDS general permit, that's for stormwater. And it's for stormwater… Point sources. It's from point sources of stormwater. And how do you, in this case, how do you decide what the point source is? Well, there would be, if you looked at this Exhibit 57, when they were constructing, there would have had to have been, to use the definition, pipes, conduits. Is the point source revealed by the papers, by the permit itself, or is that something that, is that a question of fact or something? It's a question of fact. The permits itself do not, because the permit is a general permit of statewide applicability. It can't be changed. It's a permit. You file a notice of intent to comply with this general permit. And the answer is you can comply and discharge through point sources to the waters of the state. Or you can't. And one of the preconditions of getting that approval is filing a stormwater pollution prevention plan. That's the stormwater that's run off its construction site? Correct. That's the point source? Well, no. It's running into that river? A construction site can't be a point source. Well, what is a point source? We don't know. Is that what you're saying? We don't know. I mean, this isn't our argument. We filed a RCRA citizenship. We didn't. And we think this general stormwater permit is a red herring. It's like saying we're in compliance. I mean, the bottom line is that. Does RCRA have anything to do with point sources? It doesn't. And not. It does not. It doesn't deal with surface water quality. RCRA deals with what happens on the land. What happens with specific chemicals and constituents. The confusion, Judge Posner was, if I would urge you to read Inland Steel, the Judge Posner decision, because he gets it right, that it's very confusing because solid waste and hazardous waste can be liquids. But when they're discharged through a point source from an NPDES permit, they are exempt from the definition of solid waste. That's when they are. But the point that we would get into, and you can see it from the documents, and you can see it from just looking at the definitions in the Clean Water Act, stormwater is not toxic and hazardous substances. Toxic and hazardous substances are dealt with by a different section of the Clean Water Act than stormwater is. Stormwater regulated under Section 1342P of the Clean Water Act. And it's stormwater only. Construction sites are one type of industrial facility that are identified as having to comply with the stormwater regulations. Hazardous and toxic substances are dealt with through process water NPDES permits. Process water NPDES permits require complicated, expensive treatment technologies to control for these toxic and hazardous substances. Stormwater only is just rainwater that picks up dirt. All that you have to do to comply with the stormwater permit is have best management practices. And this was a stormwater permit? Is that what you're saying? The stormwater permit that Judge Bennett seemed to rely on is having somehow superseded the obligation to comply with hazardous waste management, with stormwater, with solid waste management. What kind of discovery did you want to do that you didn't get to do? Well, one, I might subpoena the Maryland Department of Environment and EPA to see if they agree that the general stormwater permits do supersede the obligation of industry to comply with the hazardous and solid waste laws. The bottom line is that we identified the regulation that EPA adopted to, we think, avoid anti-duplication. What could be done now? Well, I don't know if it's in the record or not, but somebody put in here that that casino's been built. The casino's been built, but we're not trying to stop the casino. We're trying to... You're not trying to stop the casino? No, we never did. But Judge Bennett says you're trying to stop the casino. Who says that? I thought Judge Bennett said that in the first... Judge Bennett said that, correct, and that was an error right up front, which showed, we think, clearly... But you're not trying to stop the casino? No, no, no, in fact... Is it operating up there? It's operating, it's operating, but if you look at... So people are going in there and gambling right now? No, no, we don't want to, we don't, you can do, there's a lot of... Can anybody try to put anything in the record, supplement the record below? I mean, there's nothing, the record on appeal doesn't reflect all this stuff, right? About the casino being built and everything. It does not, the record does not. We're talking about things that are out of the record. Correct, correct. What is it that you... If the casino's built and you don't want to stop the casino, what is it that you want done? Well, the fundamental thing that you can do at a contaminated site is, number one, you can sample and analyze. If you looked at Exhibit 1 of the complaint, we've identified that there's no groundwater monitoring wells. There's no... I'm sorry, go ahead. Are we supposed to go digging up underneath the casino or what? No, you would, there's the waterfront parcels that are impacted by what happened at the casino. There's the waterfront parcels that have been impacted by the industrial history on the Warner Street properties. Would you have to go in there and repair it with the casino sitting there? You could do that. You can get, that's what hydraulic fracking's all about. You can go, you can put wells in, but first they need... The rest of the hazardous stuff's down the hill from the casino? There's not enough evidence. There's not enough evidence to conclude that. You don't know where it is. What you would do is you would put monitoring wells, groundwater monitoring wells, off-site. Right now they're not in the waterfront parcels. There's none off-site. There's none in the river. They didn't have to do that for this response action plan, which is part of the school and water permit. They said, we think it's not part of the school and water permit. And if you look at the inland steel analysis, Judge Posner was very clear that if the Clean Water Act doesn't require it, you can't just add it to the permit and make it part of the Clean Water Act. So the response action plan we think is not part of this permit. But if you go to the remedy that we would seek, it would be to further investigation off-site, further investigation of, if you look at our... This is turned red, Your Honor. Do I... Go ahead and finish. I can finish. The... You can use the monitoring wells that are on the site already, even though they've built a casino. There are a number of monitoring wells on the site. You can put new monitoring wells in without disturbing the operation of a casino. It's done all the time. And if the monitoring shows high levels of contamination, like we think the record already shows, because we cited the studies that the appellants, the appellees had created. We cited their own studies to show that there's contamination. So you can remediate groundwater without disturbing buildings on site. You can clean up the park and the waterfront parcels. And if there's any impacts in the river shown by the investigation that hasn't been done, you can clean that up. Thank you. We've got some time for reply. Let's hear from Ms. Sweeney.  I'm Rosalyn Sweeney, Counsel for CBAC Gaming and CBAC Borrowers. We ask that you affirm the dismissal of CBAC by the district court. I'll briefly address the appellant's arguments on judicial notice, some of which they did waive for the purpose of appeal. And I'll then address why CBAC's activities were covered by its industrial discharge permit, and why that permit bars a citizen suit under RCRA. What's your best view of the district court's opinion? On what basis did it dismiss your client? Was it a jurisdictional basis under B-1, or a failure state of claim under B-6? I believe it was a jurisdictional basis under B-1. That was the basis on which we moved. And the appellants did not request any discovery with regard to the documents we submitted. In their papers before the district court, they debated the meaning of the documents that were submitted by CBAC. But they didn't request any discovery, nor did they after the district court gave them the opportunity to file a SIR reply when they didn't like the decision. They didn't file a motion for reconsideration.  And they should have done that under Rule 201E. What kind of hearing are you talking about? If they wanted to challenge the taking of judicial notice at any point in the district court, under 201E, they were obliged to make that request. Well, did the district court ever tell anybody they were taking judicial notice? It's not in the opinion that I can find. They did not. There's nothing in the opinion about judicial notices. You all characterized it as judicial notice, but the judge didn't. The court does recite, in his opinion, the standard with regard to both 12B-1 and 12B-6, which indicates that he was taking judicial notice of the documents. Your Honor, we had no obligation to file a motion requesting judicial notice. Both CBAC and the city indicated in their papers that they were seeking judicial notice. And there's authority in the 5th, 8th, and 11th circuits that holds that there's waiver where the plaintiff fails to request a hearing and fails to file a motion for reconsideration. And I can give you the sites of those cases. And this is a hearing under 201 on judicial notice, not a hearing to convert to summary judgment? Correct. Well, what if we just assume for purposes of argument that the district court did dismiss your client on a 12B-1 basis? If we disagreed that the anti-duplication statute was jurisdictional, what happens in that situation? Well, Your Honor, I think even under 12B-6, the court is entitled to rely on matters of public record. And I think that the SPS versus… If the district court didn't make a 12B-6 decision as to your client, wouldn't they have to send it back for him to do that? Well, the court could only have decided as 12B-1 or 12B-6. I mean, those are our only two options. You said he decided under 12B-1. And if the anti-duplication thing is not jurisdictional, then that's an error. To give you a dismissal for a lack of jurisdiction on a ground that's not jurisdictional. I agree that we… That's what Judge Macy walked you into. Okay. If it is not jurisdictional and it was, in fact, an affirmative defense, the 12B-6, there's still evidence… The court was still allowed, under a 12B-6 motion, to consider the information that was presented to it. You can prevail on an affirmative defense on 12B-6? Yes, Your Honor. How about that tests the complaint, whether the complaint states a claim? Well, in SPS versus Setterstall… Pardon me? You can go in and throw it right out on a 12B-6? I'm sorry, Your Honor? You can go in and throw it out on a 12B-6? Well, in the Setterstall case… Without converting it to Rule 56? In Setterstall, the court dismissed on limitations grounds… These guys are going to get awfully confused with all these numbers, but that's a pretty roundabout approach there. They got a… Well, Your Honor, isn't limitations decided on 12B-6? Pardon? You went on 12B-6 on an affirmative defense without converting it to summary judgment, without discussion? Yes, and in the Setterstall case, the court decided multiple claims on a 12B-6 motion using… The district court did? The district court, Your Honor. Judge Motz in Setterstall versus SPS decided, based on limitations, using matters of public record. A consent decree, deeds, and an application for the voluntary cleanup program. All that may be correct, but wouldn't we ordinarily let the district court do that in the first instance? I mean, it sounds like you're asking us to make a 12B-6 decision in the first instance here. Your Honor… Which I don't blame you if you are, but I just want to be sure. Are you saying that we have a right to affirm on an alternative ground? Yes, Your Honor. And we do? Yes. There you go. Sorry, Your Honor. Thank you very much. No, we can do that. We have a right to do that. Yes. Whether we should do it or… In the alternative. In a particular case. Correct, Your Honor. We can affirm on an alternative ground if it's prepared on the record. Yes, and it's available on the record. Your Honor, I would like to, if I can move on, to mention preliminarily that the district court should also be affirmed based on just basic fairness as a matter of public policy. And in support of that, I'll direct your attention to Wisconsin Resource Protection v. Flambeau Mining, which is a case where a state permitting agency actually didn't provide the defendant with NPDES permit coverage, but instead covered the defender under a state mining permit. And the Seventh Circuit held in that case where the mining company had gotten essentially the only permit the state would allow, it would not be subject to citizen suit. And that is a situation similar to that of CBAC, where the RCRA and Clean Water Act authorized permitting agency in the state of Maryland basically does not require, and in fact will not allow, a property that is going to participate in the state voluntary cleanup program to have a treatment storage and disposal facility issued under RCRA. And that's Section 7501G23 of the Maryland Environment Article. So my client got exactly what it was supposed to get from the permitting agency that EPA recognizes in Maryland under both of these statutes. Moving on, Your Honor, the plaintiff's arguments with regard to anti-duplication fall basically into two categories. One is the scope of Clean Water Act coverage, and the other is the RCRA non-duplication provision. And unless you prefer a particular order, I'll address the scope of coverage first. The appellants make basically five arguments with respect to the scope of coverage under the Clean Water Act. These are that the response action plan and the erosion and sediment control plan are actually just creatures of state law and are not enforceable in a federal action. And I'll note that Judge Bent noted in his decision at footnote 37 that that argument was not presented to him below. The other arguments they've made are that Clean Water Act does not regulate groundwater, doesn't regulate activities, that the construction site was not a point source, and that the wording of the permit itself, the general permit, did not cover CBAC's activities. All of their arguments are wrong. With regard to whether or not the Clean Water Act can regulate groundwater, we've provided you with ample authority that when there's a hydrologic connection between groundwater and surface water, the Clean Water Act can regulate it. And they've offered nothing to the contrary in that regard. In fact, the case they provided you the court with last night at 10 of 5 also recognizes that when there's a hydrologic connection between groundwater and surface water, it can be covered and regulated under the Clean Water Act. The Williams case is particularly significant here. In that case, remediation activities at an oil storage facility were incorporated. The plans for that remediation were incorporated in an NPDES permit. And the court there found that the facility owner who was conducting the cleanup was shielded from RCRA and Clean Water Act liability by virtue of having an NPDES permit for its activities. The casino construction site was also a point source. The plaintiffs referred to two cases in their briefs to support the argument that the construction site was not a point source. And one of those cases, neither has anything to do with construction sites. And one of them, the ecological rights case, is actually useful in terms of its description. What is the point source? Well, as ecological rights says, stormwater is not inherently a point source or a non-point source. But the Clean Water Act regulates point source. It does. So what's the point source here? The point source here is the construction activity, which is defined by EPA in regulation as a point source. And it is regulated in the state of Maryland via a general permit. And the record here shows that... Is that a question of law or a question of fact? Question of law. And Judge Bennett, below, looked at the terms of the general permit, compared it to the claims, and concluded that the activities that were authorized by that permit are, in fact, covered in their entirety by the permit. So your position would be that whatever ran off the casino site and stormwater from the construction site and whatever dig it and all went on there, all that is covered under the NPPS permit? Yes, Your Honor. And the wording of the permit itself makes that clear. The appellants cite to one paragraph of a 30-page permit, and they ignore the two paragraphs that follow the permit. They rely on Part 3A1 of the general permit to say, oh, the permit only authorizes stormwater discharges. But 3A2 and 3 also say, and anything that's authorized under the erosion and sediment control plans that are incorporated, that are required by this permit. And the plans are not only required by the permit. Roman numeral 6R of the permit says that those plans are federally enforceable. And it's clear from the record that the plans incorporated the response action plan. And there's nothing that the appellants have indicated, no activity on the part of CBAC, that was not governed by either the response action plan or the erosion and sediment control plans. And they complain about two things that my clients did, that they removed buildings and paving, and that allowed rainwater to infiltrate at a greater rate than it did when the old buildings were still there, and that they moved dirt around on the site. Well, it's clear that the plans envision that the buildings are going to be removed, and the documents that my client filed with the state of Maryland to get coverage under the general permit said exactly that. They said, we're going to take the old buildings down, we're going to remove paving, and we're going to build new buildings. And the response action plan was approved by the same agency that issues the general permit, and that won't allow a RIFRA permit for this type of activity at a brownfield site. That facility is entirely completed? It is, Your Honor. That includes the parking garages? Yes, Your Honor. And the appellants in their brief acknowledged that the building is complete and that it's open, not only here but also in the papers filed before you. The whole facility is completed. With regard to whether or not the whole facility is a point source, that is the trigger for whether or not you're a point source. Your acreage decides whether or not you must obtain coverage under an NPDES permit. If you're over an acre, you need permit coverage because you're a point source. The CDAC cited three cases that hold that Clean Water Act permits regulate activities. Those are Coon, Jones, and Williams Pipeline. With regard to the significance of NPDES permit coverage under RIFRA's non-duplication provisions, multiple courts have recognized that coverage under a Clean Water Act permit can bar a RIFRA claim. CDAC cited four cases for that proposition called Danny, which was a motion to dismiss. Coon v. Willa Derry, Jones v. Snell, and Williams Pipeline. The appellants cited a fifth case that recognized that an NPDES permit can bar RIFRA claims, and that's Waterkeeper Alliance v. U.S. Department of Defense, where some of the RIFRA claims asserted there were dismissed because of NPDES permit coverage. Another three decisions cited by the appellants, Community Association for Restoration of the Environment, Raritan, and State of New York, recognized that on the right set of facts, an NPDES permit can bar a RIFRA claim. The facts were simply not present there. Unless you have further questions, thank you. Good morning, Your Honors. Thank you. May it please the Court, I'm Matthew Naden, representing the Mayor and City Council of Baltimore and the Baltimore Development Corporation. If, with your permission, I'll refer to them collectively as the city or Baltimore City. The issue with regard to the city in this case is whether or not the appellant alleged a claim which could survive plausibly against the city under two sections of the RIFRA statute. In order to understand why their allegations, while in some instances specific, in other instances very vague, could not plausibly succeed on any set of facts, it's important to look at their whole complaint. The first 50 or so paragraph allegations basically lay out the history. Paragraph 48 makes it very clear that over more than a century, these properties had been used for industrial purposes, and that according to the appellants, many, many pollutants had been injected or dumped into these sites. And in paragraphs 50 to 56, they make it clear that by the late 1990s, 2000, tests had been done, making it clear that those contaminants were migrating across the peninsula into the waterfront. The allegations against the city by the appellants are quite narrow. A few activities alleged in paragraphs 91 through 93 of the complaint, that the city gained ownership of the majority of these properties around 2008. Concurrently, it was applying... At least you all owned about 15 acres? I'm sorry, Your Honor? You all owned about 15 acres or something? I think that's about right, including the waterfront parcels. And it was polluted. Yes, and that's not disputed. That's established. We have to accept that for purposes of this proceeding. It's a contaminated site, correct? Correct. The city wants to get it all cleaned up. The city may very well have that interest in the process that took place for establishing this casino and the voluntary cleanup program that those sites were entered into. And the agreements with the state and the oversight of the state are part of the process of cleaning up the sites generally and the peninsula generally. Why don't you tell us why the plaintiff's complaint doesn't contain sufficient allegations of liability either under subsection A or B? So the only allegations with regard to the city are that it took, in 2009, it took limited actions to remove a couple of potential sources of contaminants. According to the allegations, remove an underground storage tank and some soil connected with some contaminated groundwater pits, all of which had been left behind by the previous industrial owners. Didn't they allege that your actions had exposed contaminants in and under the casino site and waterfront parcels to increased infiltration of rainwater? They made a general allegation that the activities of all the defendants had done that, or at least that CBAC in constructing the casino and the city's actions combined had had some general effect to that extent. All right, why is that not a no? Well, the specific allegations were that the only activities that the city took were to remove potential sources of contaminants. And there's no logic to the concept that by removing in that limited way a few potential sources of contamination, you've somehow contributed to a contamination which is overwhelming across the peninsula. But isn't that the kind of subject that's typically resolved through factual determination? Not in this instance, especially since a few years after this. Is it joint and several liability? That has not been asserted or argued by the plaintiffs. So, at the moment, no. Is the deficiency completing as you see it? Does that go to both subsection A and subsection B? Yes, it does. It goes to subsection A because their only allegation of a violation of a RCRA rule or regulation or requirement is that the city was maintaining a treatment storage or disposal facility without a permit, and this site has never been such a facility, and they cite no authority for that proposition. Furthermore, as you've been discussing, the casino has been completely built, so it's certainly not such a facility today, and there's no continuing violation under subpart A. Under subpart B... So, is your claim under A that they didn't plead an ongoing violation as to the time of the violation? That they didn't plead a violation adequately and that they did not plead an ongoing violation. Under subsection B... Is that fatal to a claim under A? Yes, yes it is. So, for B purposes, they pled something happened in the past. Why is that sufficient? The case law indicates it's not, but moreover, it's also important to realize that those limited remedial activities that the city took in 2009 were completely superseded. How's that established in the record, what they did in 2009? That's in there. The facts were read the allegation of the complaint, which we have to take as true, just as the defendants did this stuff. Right, and the allegation is that we... The defendants didn't limit it, the defendants. The allegation that the plaintiffs made against the city was that the city removed underground... Right. ...moved some soil, which the case law makes clear is not enough, in order to remove an underground storage tank, which is not a positive contribution to the police. In the context of this case, how would you determine it's not enough, and not a positive contribution without having discovery and expert witnesses and everything, and figuring all that out? Because removal... How would you figure that out in the face of a complaint? Because when the allegation is that you removed pollutants, the conclusion can never be that you've added pollutants. And you stirred up some more of them. Well, that part is the case law does not acknowledge. The case law rejects the theory that moving some dirt around under a voluntary cleanup program is sufficient to make a subpart B argument. But in addition, all of the limited remedial activities of the city were completely superseded by the construction of the casino, which dug 60 feet underground and removed all of that material and created a building in the few spots that the city remediated. Can you come to that conclusion on a motion to dismiss just on the pleadings? Yes. Yes, of course you can, if the logic is obvious. These plaintiffs were facing an insurmountable hurdle to try to saddle the city with the responsibility for remediating the 100 years of pollution. And they could only come up with these couple of remedial activities that the city engaged in in 2009. There is no rational way that you could come to the conclusion that that contributed to today a current substantial and imminent endangerment of health and environment. There is no possible way that you could come to that conclusion under any set of facts. Without any evidence. It's not possible that that kind of evidence could ever come forth. You could never prove that. And it's not logical. It makes no sense. And that's why they had an insurmountable hurdle and that's why you're not hearing much about the city. We're very much like... I'm sorry to cut you off, but you're out of time. We need to hear from Mr. Walsh. Thank you for your argument. Thank you. Good morning, Your Honors. May it please the court, my name is Don Walsh. I'm here on behalf of Maryland Chemical. We are, we perceive, as being sort of the small part in all this. Not only factually, but in the reality of the way that this case has come to the court. Maryland Chemical was a past owner of this property. As the plaintiffs... Well, you are one of the original culprits, weren't you? That's certainly what the plaintiffs... That's not actually what the plaintiffs have said, Your Honor. Pardon? That's not what the plaintiffs or the appellants in this case have said. I thought you all owned it for 50 years and operated a chemical plant. We did, Your Honor. That's absolutely correct. But what you'll see is that the plaintiffs also allege that this particular property was used for industrial purposes for over 100 years, long before Maryland Chemical even came to that particular site. And I think that's the bigger part of all this. That's why we're considered sort of the small potatoes in everything here. We did occupy a small portion of this property. There were 11 parcels. How many acres did you all occupy? I'm sorry, Your Honor. How many acres did you all sit on? Your Honor, I'm not sure about the acreage. There were 11 total parcels that made up the casino property. We were only three of them. We were three small portions of this particular piece of property. So you all were down the hill from where the casino sits? I think the allegation is we were further up the hill, Your Honor. Up the hill, okay. And as a result, things might have flowed through our particular property. And I think that's part of what... That had to flow down the hill to get to the... To the waterfront. Correct, Your Honor. And I think that's basically what the plaintiffs are attempting to say. What Judge Bennett did in looking at this, we were 12B6. I think that, from our perspective, that seemed pretty clear. The judge said simply there wasn't enough evidence in this particular case. Not enough allegations to suggest... Well, how about paragraph 51? They've got some pretty specific allegations of spills of specific chemicals and specific addresses. Why not enough? Well, Your Honor, part of the problem is you have to put it in the context at the beginning of the complaint where they talk about the industrial uses of this particular property and these parcels for over 100 years. We... There may have been spills that occurred. They don't say who spilled it. They don't say what action was taken in response. They identify four specific spills that you all did. They said during the tech period that we were there, Your Honor. They didn't say that they're necessarily our responsibility. We own the property. We don't deny it. Well, when you're on the property, that is your responsibility. You own the property, I thought. Absolutely, Your Honor. But they don't... They identify four. I remember that. Correct, Your Honor. And they said it was 100 years. You said you're only there 50. Somebody else was there the prior 50. Who was that? Correct, Your Honor. And what they also don't talk about is the surrounding properties. What they don't talk about is whether there is any other contamination. They've not baselined the property in any way. That's the biggest problem we have here. If you do that, though, on summary judgment, you'd have to have some evidence. I mean, they say right here in paragraph 51, you spilled this, that, and the other, and where you spilled it. Tell me why that's not enough to get past 12B6. Your Honor, I agree. If we got to a summary judgment motion, I think we'd prevail at that point, too. But at the pleading stage, with the heightened pleading standards, I think Judge Bennett certainly defined, was that you have to be more than speculative. RCRA actually says... Well, for purposes of 12B6, what it says in that paragraph 61 is taken as true. I agree with you, Your Honor. But you all dumped all that stuff. Even if we dumped all that stuff, Your Honor, what the plaintiff has the burden of showing is that what our actions did substantially contributed to an imminent and substantial threat to this particular property. But even if the burden is showing it right now, you still have the burden of alleging it's sufficient. Sufficiently alleging, not making conclusions, Your Honor, is what they can't do. And what RCRA says is that you can't be speculative, you can't be remote, you can't be conclusory in sort of making these allegations and things that harm happen or that there's an imminent threat. We owned the property for a period of time in the grand scheme of over 100 years of industrial use. We owned a small portion of that property. We didn't own the entire parcel that we're talking about. What they haven't done is they haven't baselined our property in any way. They haven't said that the property before you guys had these spills was pristine. There was no pollution. There was no problems. I think actually they've admitted the property probably was contaminated before Maryland Chemical came into existence and resigned it. The problem is that we have a conclusion saying just because you were there, just because a particular spill happened during your time frame, that automatically makes you responsible for everything that happens after that point in time. They're not looking at what the property looked like. They haven't alleged that even if they clean up our spills, if our plume that they allege exists was stopped, that that would actually clean up the waterfront property. They haven't talked about the contiguous parcels of property at all. They talked about hot spots. You all ran on those hot spots? I don't believe that we were, Your Honor. The parcel itself, it depends on where exactly the testing was done, whether it was under the three parcels that we owned or whether it was under any of the other parcels. So because of that, Your Honor, we think the court easily could conclude that it's too speculative. You need more evidence to demonstrate that in this particular case. They didn't get any evidence. I apologize, Your Honor. I keep saying evidence, and I mean allegations. You'd like to have a good argument to make to a jury or to make on a summary judgment motion in those terms. I agree. But you're here on 12b-6. I agree, Your Honor. I apologize. I keep mistaking. I should say allegations. And I think that's part of what it is. Judge Bennett also had another decision that was cited in the record as well, the Robinson decision, where he looked at the same property, another lawsuit that was filed dealing with the casino, dealing with contamination issues. That's what he said at the beginning. This is another suit challenging the citing and construction. And our friend, your friend on the other side, starts off by saying he's not challenging the citing. He's not challenging the construction. Either one. He says you're wrong. You're wrong. The judge is wrong on that, right off the bat. I understand that's what the allegation is at this point. He's saying he's not asking to tear down the casino. I understand that's where he is at this point in time, Your Honor. But the other aspect to this is the fact that ultimately they have to demonstrate that we have an imminent, substantial threat to the property. If, in fact, we have a situation where the property itself has been subject to significant defenses, significant remediation, as well as a wrap, we believe that would insulate us from any liability as well. Thank you, Your Honor. Thank you. Mr. Henderson, you have some time remaining. May it please the Court, I think one common theme among all three of my esteemed counsel is that there's a lot of disputes of fact in this case. There's a lot of disputes of fact. We're still disputing, you know, what the complaint says. The complaint, I'll start with Mr. Naden. The complaint is very clear that Maryland Chemical contributed to the constituents that are found in the soil, in the groundwater. In fact, if you look at Exhibit 1 of our complaint, the PCE contamination is directly from Maryland Chemical. We allege that. And that's one of the worst chemicals found there. And it's created this huge groundwater problem. The other thing is he keeps talking about we're not specific enough about which property. You don't have to be specific. You have to show that the party you're bringing the case against because it's a joint liability. And I'm not sure why he asserted we didn't. I don't know. I think Mr. Naden asserted that we did not assert that there's a joint liability. There is. RCRA is a joint liability statute. We didn't have to identify every source of the contaminants from going back 100 years. We picked Maryland Chemical, and it was based a lot on its own studies, the Glouse study that we identify in the complaint. I do want to address the brief recitation of cases by Ms. Sweeney on behalf of CBAC. The anti-duplication cases she cites all deal with a different type of wastewater discharge than a stormwater. Stormwater is stormwater. It's rainwater. The Kuhn case, which went to the Second Circuit, focused on cow manure. Cow manure is identified as – it is the contaminant from a source that's identified in the definition of process discharge. And that's regulated under Section 1342A. The Williams case, I think it was in Iowa, that's focusing on oil, petroleum-related materials. Discharge of that was the very target of the lawsuit, of the citizen suit. In this case, we targeted the handling of hazardous and solid waste and toxic waste, the toxic materials. Those are not covered by the stormwater permit, and it's very clear. And you don't have to just look at the permit that they've got in the record. You can look at the law. The law makes it very clear. If you look at 40 CFR 122.26a, the definition of stormwater that's regulated by those permits is stormwater only, not solvents, not toxics, not chemicals. Those are regulated by another section of the Clean Water Act, Section 1317. So Section 1342P of the Clean Water Act just deals with stormwater, and that's what this general stormwater permit applies to. This recent case that was just decided in February from the Northern District of California, San Francisco Hearing Association, I think does a good job of explaining, putting into context all the cases under anti-duplication. And it identifies two specific things. It says that the cases that they found compelling are the ones that focused on whether there was a complete overlap of the two programs, complete overlap of the Clean Water Act permit, in this case, and the allegations in the citizen suit, or if there's not. If there's gaps, then those gaps have to be regulated. The anti-duplication clause can be used to create regulatory gaps as a way for, for example, industries to escape by filing a notice of intent. They can escape compliance with REPRA potentially if Judge Bennett's decision is upheld by filing a notice of intent to start a construction site, and then they can start managing hazardous waste without complying with REPRA. The other thing that the recent case focuses on is the timing, the timing in the context of the life of the case. It makes it very clear that it's inappropriate to dismiss a case based on, to dismiss a case before discovery. And it cites very favorably the Raritan Bay case, which we cite. So that, you know, the bottom line is the factual dispute has to be fully vetted. And one of the fundamental disputes is what is the clean, what is this general permit that was issued to CBAC really covering? Does it include this response action plan? And our position is no. It's this Rube Goldberg kind of thing of, well, you file a notice of intent to comply with a general permit whose requirements are set in stone. You develop a stormwater management, a stormwater pollution prevention plan that also incorporates other state requirements, state-only requirements under Title IV, for example, of the Maryland environmental regulations. And then within that plan, you include construction drawings. And within the construction drawings, there's a reference to a response action plan. The things, it's like hanging, so they took the affirmative step of putting in their stormwater pollution prevention plans things that do not belong. And so it doesn't make it enforceable, and we've laid that out in our brief. Counsel, you didn't get to your, I don't think you got to your subsection A claim against the city in your first presentation. As I understand their argument, they say that the pleading is defective because you were required to plead an ongoing violation as of the time you filed the complaint. Yes, and Judge Bennett's. Where is that in your complaint? Yes, Your Honor. Well, it's, Judge Bennett focused just on the paragraphs. I asked you about the ongoing violation. And the ongoing violations are both, once you, it was, I think it was stated by counsel that all we alleged was the removal. We did not allege just the removal. We alleged that the removal caused releases, and that releases haven't been remedied. And that would have been not just in paragraphs 90 to 91. It would have been the, all the paragraphs where we alleged the construction of the casino being the source of generation disposal treatment of hazardous waste without a permit. And in violation of record that is attributed to the city as well, because they own the property. It's a joint liability obligation to get permits and to comply with record. So the judge, by allowing for the anti-duplication ruling, those were all. Hold up, hold up. He ignored all of them. Wait a minute. I'm sorry. Where in the complaint specifically do you plead there's an ongoing violation as to the city? If you can't find it right now, you can write the court a letter and tell us what paragraph you say that is. Well, we didn't. I'm sorry. I will do that. But I will say that paragraph 94 says on or before March 30, 2013, CBAC gaming commenced construction and remediation activities at the casino site. Construction are expected to continue. And later on, we do say that the city is part of those violations. And I will give you the paragraphs that specifically talk about the city's contributions from the 2008-2009 time period. I did want to also address the fact that the construction, the assertion that the construction of the casino has taken care of the contaminants that we've addressed in our complaint is just wrong. Because we have a number of paragraphs that talk about the waterfront parcels and how contaminated they are. We have a number of paragraphs that talk about the movement of groundwater, contaminated groundwater. And the fact that the casino is built doesn't stop all that. The casino and the response action plan that is so heavily relied upon by Judge Bennett's decision is deficient. And we've alleged it's deficient. It just dealt with putting a cap in the form of the building, excavating some soils, and that was it. It didn't go off site. I'm running out of time here. As far as judicial notice, I stand by what our reply brief says. There was none taken and given on these documents. And I would point out finally, well, any questions, your honors? I'm running out of time. No, I don't think so. Thank you very much. All right. We're going to come down and recouncil and then take a break. I have 10 minutes.
judges: William B. Traxler Jr., Robert B. King, G. Steven Agee